**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

CHARMAINE DICKENS                                                      PLAINTIFF

v.                                    **3:08CV00164-WRW**

AT&T UMBRELLA BENEFIT PLAN
NO. 1 - AT&T DISABILITY INCOME
PROGRAM, *et al*.                                                      DEFENDANTS

<u>ORDER</u>

Pending are Plaintiff's and Defendants' cross Motions for Summary Judgment (Doc.

Nos. 18, 20). Each side has responded.[1] For the reasons set out below, Defendants' Motion is

GRANTED and Plaintiff's Motion is DENIED.

**I.      SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate only when there is no genuine issue of material fact, so

that the dispute may be decided on purely legal grounds.[2]  The Supreme Court has established

guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is the
> need for a trial -- whether, in other words, there are any genuine factual issues that
> properly can be resolved only by a finder of fact because they may reasonably be
> resolved in favor of either party.[3]

The Court of Appeals for the Eighth Circuit has cautioned that summary judgment is an

extreme remedy that should only be granted when the movant has established a right to the

---

[1]Doc. Nos. 26, 28.

[2]*Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56.

[3]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

judgment beyond controversy.[4]  Nevertheless, summary judgment promotes judicial economy by

preventing trial when no genuine issue of fact remains.[5]  I must view the facts in the light most

favorable to the party opposing the motion.[6]  The Eighth Circuit has also set out the burden of

the parties in connection with a summary judgment motion:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*, "[to point] out to the District Court," that the record does not disclose a genuine dispute on a material fact.  It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion.  Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue.  If the respondent fails to carry that burden, summary judgment should be granted.[7]

Only disputes over facts that may affect the outcome of the suit under governing law will

properly preclude the entry of summary judgment.[8]

## II.    BACKGROUND[9]

### A.  The Plan

Plaintiff, Ms. Charmaine Dickens, began her employment with Defendant as an

administrative assistant at Pacific Bell in California in June, 1999. She transferred in December,

1999, to a customer service position with Southwestern Bell in Jonesboro, Arkansas. Plaintiff

enrolled in the SBC Disability Income Plan (the "Plan"), now known as the AT&T Disability

---

[4]*Inland Oil & Transport Co. v. United States*, 600 F.2d 725, 727 (8th Cir. 1979).

[5]*Id.* at 728.

[6]*Id.* at 727-28.

[7]*Counts v. MK-Ferguson Co.*, 862 F.2d 1338, 1339 (8th Cir. 1988) (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted)).

[8]*Anderson*, 477 U.S. at 248.

[9]Unless otherwise noted, the facts in this background section are taken from the parties' briefs and statements of material fact. Doc. Nos. 19, 20, 22, 23, 25, 30.

Income Program (the "Program"), which is a component of the AT&T Umbrella Benefit Plan No. 1. The Program includes benefits for short-term disability ("STD") and long-term disability ("LTD").

Under the terms of the Program, AT&T serves as the Plan Administrator and "has the sole and absolute discretion to interpret the Program, make findings of fact, determine the rights and status of participants and others under the Program, and decide disputes under the Program."[10] The Program allows the Plan Administrator to "delegate any of its duties or powers" and "to the extent permitted by law, such interpretations, findings, determinations and decisions shall be final and conclusive on all persons for all purposes of the Program."[11] Based on this provision, the Program delegated to the Claims Administrator, which at all relevant times was Sedgwick Claims Management Services, Inc. ("Sedgwick"),[12] the authority to determine whether a claimant who filed a claim is entitled to benefits.[13]

In the Program, STD is defined as: "because of Illness or Injury, you are unable to perform all of the essential functions of your job or another available job assigned by your Participating Company with the same full-time or part-time classification for which you are qualified."[14] To receive benefits, a claimant must provide satisfactory medical documentation[15] and be "under the care of a Physician and follow his or her recommended treatment plan."[16]

---

[10]Administrative Record ("AR") 845.

[11]*Id.*

[12]AR 660-811.

[13]AR 849.

[14]AR 819.

[15]AR 820.

[16]*Id.*

With respect to LTD, the Program provides:

"Total Disability" or "Totally Disabled" for long-term disability means that because of an Illness or Injury you are prevented from engaging in any employment for which you are qualified or may reasonably become qualified based on education, training, or experience. You will be considered Totally Disabled for a long-term disability if you are incapable of performing the requirements of a job other than the one for which the rate of pay is less than 50 percent of your pay (prior to any offsets) at the time your long-term disability started.[17]

To be considered for LTD, the claimant must receive the maximum duration (52 weeks) of STD benefits, be under care of a physician, and follow the physician's recommended treatment.[18] The Program further provides that the benefits will end: (1) if the Claims Administrator determines the claimant no longer meets the requirements of Total Disability; or (2) if the claimant fails "to provide Medical Documentation or other information reasonably required by the Claims Administrator . . . ."[19] If eligible, LTD benefits are calculated at 60% of the claimant's basic monthly wage rate at the time of the disability, minus any other sources of disability income.[20]

## B.  Plaintiff's STD Claim

As a service representative, Plaintiff handled customer complaints, corrected customer problems, sold specific services to new and existing customers, and communicated with other

---

[17]AR 828.

[18]AR 829.

[19]AR 836-37.

[20]AR 645.

departments.[21] Her position was sedentary in nature and had no physical requirements, except for talking, typing, and sitting.[22] Plaintiff's last day of work was July 18, 2002. At that time, Plaintiff complained of depression, anxiety, nausea, vertigo, and insomnia, all aggravated by Meniere's disease in her left ear -- a condition from which she had suffered for a long time. Meniere's disease is a disorder of the inner ear that is characterized by episodes of vertigo, tinnitus, pressure in the ear, and fluctuating hearing loss. Based on the information provided by her physicians, Plaintiff began receiving STD benefits on July 26, 2002.[23]

Plaintiff's family practice physician, Dr. William Hurst, referred Plaintiff to Dr. John Jiu, who Plaintiff saw on August 27, 2002.[24] During a follow-up visit approximately one week later, Dr. Jiu confirmed Plaintiff's Meniere's disease and positional vertigo diagnosis. Dr. Jiu administered a treatment plan,[25] which included several surgeries to begin on September 6, 2002.[26] After the surgeries, Dr. Jiu noted that Plaintiff showed signs of continued progress and that her work restrictions were temporary in nature.[27] Dr. Jiu recommended that Plaintiff have an MRI and then follow up with Dr. John Dornhoffer, an otologist at the ear, nose, and throat clinic at the University of Arkansas for Medical Sciences.[28] On April 14, 2003, Dr. Dornhoffer confirmed Plaintiff's Meniere's disease diagnosis and ordered Plaintiff not to drive, operate

---

[21]AR 149.

[22]AR 146.

[23]AR 92.

[24]AR 181.

[25]AR 183-84.

[26]AR 118.

[27]AR 85-87, 96, 110, 113-14, 134, 141, 176, 180-81.

[28]AR 49-51, 85-86.

heavy machinery, or work in elevated areas;[29] however, Dr. Dornhoffer also stated that Plaintiff

could return to work with restrictions because she felt good some days.[30]

### C.  Plaintiff's LTD Claim

Plaintiff's STD benefits expired on July 24, 2003, when her eligibility for LTD benefits

began.[31] On May 13, 2004, Plaintiff reported that she had an endolymphatic shunt put in her left

ear to relieve her vertigo and that her post-surgery vertigo was not as severe.[32] On February 18,

2005, Dr. Dornhoffer again recommended that Plaintiff "avoid driving, working with heavy

machinery and in elevated areas," but opined that Plaintiff was capable of sedentary work

although she might have frequent sick days because of dizziness.[33] About one month later, Dr.

David Hinkamp performed an independent medical review for Sedgwick and agreed that

Plaintiff was capable of performing sedentary work.[34]

Plaintiff saw Dr. Dornhoffer again in December, 2005.[35] Nothing in the record indicates

that Plaintiff sought treatment for at least a year. Plaintiff next visited Dr. Hurst in January, 2007,

after Sedgwick requested an update.[36] Dr. Hurst noted that Plaintiff's Meniere's disease only

recurred when she "quit taking her medications that were given to her by her ear nose and throat

---

[29]AR 50.

[30]AR 35.

[31]AR 235.

[32]AR 244-48.

[33]AR 254.

[34]AR 260.

[35]AR 290.

[36]AR 288-90.

specialist" and that Plaintiff was back for an evaluation and to get back on the medication.[37] Dr.

Hurst further noted that Plaintiff stated "that a couple of days after she stopped taking the Bumex

and potassium specifically, she became more dizzy and the Meniere's disease recurred."[38] A

couple of months later, Plaintiff saw Dr. Dornhoffer again. His notes indicate that Plaintiff had

not had an episode of vertigo for approximately four months and her last episode lasted only five

minutes.[39] After receiving Dr. Dornhoffer's report, Sedgwick noted that "[m]edical

documentation shows no significant change in condition" and that a follow-up with Plaintiff

would be needed in six months.[40]

By July, 2007, Plaintiff's Meniere's disease had spread, and a similar endolymphatic

operation was performed on her right ear.[41] However, an August 2, 2007, report, allegedly from

Dr. Dornhoffer's office, stated "[f]irst 2 days had vertigo, but has been good since."[42] The report

further indicated that Plaintiff was scheduled for a follow-up examination on March 17, 2008.[43]

On March 15, 2006, the Plan Administrator informed Plaintiff that because of her award

of social security benefits, the Plan was entitled to reimbursement for overpayment of her LTD

benefits.[44] To recover the $28,220.88 in overpayment, Plaintiff's monthly disability benefits

---

[37]AR 442.

[38]*Id.*

[39]AR 292, 1401.

[40]AR 293.

[41]AR 1125.

[42]AR 411-12.

[43]*Id.*

[44]AR 418-21, 423, 1312-15.

were scheduled to be reduced to $0 from April, 2006, until October, 2008.[45] On August 23, 2007,

Plaintiff contacted the Plan Administrator and requested to pay off the remaining overpayment

so she could again receive monthly benefits.[46] On September 17, 2007, Plaintiff paid Defendant

$12,428.72 to reimburse Defendant for overpayment.[47]

On October 24, 2007, Sedgwick sent Plaintiff a disability questionnaire and medical

authorization to be completed as part of the ongoing review of her LTD benefits claim. The letter

specifically requested Plaintiff complete the forms, and once returned, Sedgwick "will request

copies of medical records from the treatment providers you identify." This statement was

consistent with Sedgwick's previous practice, which was to directly request medical records

from the medical care providers identified by Plaintiff. On November 11, 2007, one day before

Plaintiff returned the forms, the Plan administrator sent Plaintiff a letter that reads "[b]eginning

with your next medical update on your long term disability claim" certain changes will go into

effect.[48] Among these changes, Plaintiff would now be responsible for providing relevant

medical records on her own, and would be required to pay any charges for these records.[49] The

letter further stated "[i]f the requested information is not received by the due date, it may impact

your ongoing LTD benefits."[50]

On November 21, 2007, Sedgwick sent Plaintiff an identical disability questionnaire and

medical authorization for completion and cautioned that if Plaintiff's response was not received

---

[45]*Id.*

[46]AR 325, 1020.

[47]*Id.*

[48]AR 1056.

[49]*Id.*

[50]*Id.*

by January 22, 2008, her "claim will be denied for failure to provide information under the plan/program provisions."[51] When Plaintiff did not respond to the original request, Sedgwick sent Plaintiff another letter requesting her medical records, along with another LTD questionnaire, an authorization to release medical information, and information for Plaintiff's corrected phone number.[52] Plaintiff failed to provide the requested medical records a second time; therefore, in a January 23, 2008, letter, Sedgwick terminated Plaintiff's LTD benefits effective February 1, 2008.[53] Sedgwick claimed the termination was based on the fact that "as of the date of this letter, we have not received any medical documentation to establish your continued inability to perform any job."[54] That letter also provided Plaintiff with the information necessary to file an appeal.[55]

Upon receiving the termination letter, Plaintiff wrote Sedgwick and stated "I did send those requested papers back and I am now faxing them to you."[56] The documents attached to the fax were the same ones Plaintiff signed and returned to Sedgwick on November 12, 2007.[57] Plaintiff also indicated that she was requesting Dr. Dornhoffer's records and would have them forwarded directly to Sedgwick.[58] Plaintiff requested that Dr. Dornhoffer's office mail the

---

[51]AR 346.

[52]AR 373.

[53]AR 389-90.

[54]AR 389.

[55]AR 396-99, 1089-1093.

[56]AR 1096.

[57]AR 1097-1101.

[58]AR 1096.

records directly to Sedgwick, and Plaintiff also faxed a copy of the records to Sedgwick immediately after she received them on February 22, 2008.[59]

Sedgwick originally terminated Plaintiff's benefits because she failed to provide medical records; however, Sedgwick reviewed the records provided by Plaintiff "as a courtesy."[60] Sedgwick reviewed the additional information from Dr. Dornhoffer, but determined that the records did not provide requisite clinical evidence to support Plaintiff's disability from February 1, 2008, to the present.[61] On February 29, 2008, Sedgwick advised Plaintiff that it declined to reverse its previous decision and reiterated the appeal procedure.[62]

On March 4, 2008, Plaintiff filed her formal appeal.[63] Two weeks later, she left a voicemail with her Appeal Specialist stating that her file was complete and requested that Sedgwick proceed with the appeal review.[64] Plaintiff's updated file contained records from her most recent visit with Dr. Dornhoffer on March 17, 2008.[65] Dr. Dornhoffer noted no significant changes but found that Plaintiff is "still not able to work."[66]

On March 18, 2008, Sedgwick, for the first time, requested a physician advisor to render an opinion on whether Plaintiff could carry out her job duties.[67] Two independent physician

---

[59]AR 1109.

[60]AR 1228.

[61]*Id.*

[62]*Id.*

[63]AR 1239.

[64]AR 315.

[65]AR 1285-86.

[66]*Id.*

[67]AR 1288.

advisors were asked to review Plaintiff's entire medical file. The first report was conducted by

Dr. Thomas Klein, M.D., board certified in Otolaryngology. His report was completed on March

24, 2008, six days after the request was made by Sedgwick.[68] Dr. Klein contacted Dr.

Dornhoffer's office on March 19, 2008, but Dr. Klein was advised that Dr. Dornhoffer would not

be in the office until March 24, 2008. Dr. Klein left a voicemail with Paula, Dr. Dornhoffer's

nurse coordinator, and requested a call back within 24 hours.[69] If Dr. Klein did not receive a call

back within 24 hours, "the report will be completed based on submitted records."[70] Dr. Klein

never received a call, and he did not attempt to contact Dr. Dornhoffer again. Based on his

review, Dr. Klein opined that no clinical documentation was available which would have

prevented Plaintiff from returning to her regular job.[71] Dr. Klein concluded that Plaintiff was not

disabled from any job from February 1, 2008, through the present.[72]

Dr. Leonard Sonne, a board-certified Internal Medicine Specialist, also conducted a

review of Plaintiff's records. On March 19, 2008, Dr. Sonne attempted to contact Dr. Hurst, but

Dr. Hurst was out of the office the entire day.[73] Dr. Sonne requested a return call within 24

hours.[74] Nothing in the administrative record indicates that Dr. Hurst returned the call or that Dr.

Sonne attempted a follow-up call. Dr. Sonne's report stated that Plaintiff was not disabled "from

---

[68]AR 1291-94.

[69]AR 1292.

[70]*Id.*

[71]AR 1293.

[72]*Id.*

[73]AR 1295.

[74]*Id.*

an internal medicine perspective," and nothing would have precluded her from performing any job from February 1, 2008, through the present.[75]

On April 17, 2008, Sedgwick notified Plaintiff that the termination of her LTD benefits was upheld on appeal.[76] The letter stated that nothing in the record indicated that her condition was so severe as to prevent her from performing her job or any job as of February 1, 2008.[77] The letter advised Plaintiff of her right to file a lawsuit under the provisions of ERISA.[78]

Plaintiff filed this action on October 9, 2008. [79]

## III.   DISCUSSION

### A.  Standard of Review

Under ERISA, "[a] civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits . . . ."[80] A denial of benefits under a plan governed by ERISA is to be reviewed *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[81] When an ERISA plan grants discretion, courts review a plan administrator's decision under an abuse of discretion standard.[82] A plan administrator's decision will be reversed

---

[75]AR 1297.

[76]AR 317.

[77]AR 318-20.

[78]*Id.*

[79]Doc. No. 1.

[80]29 U.S.C. § 1132(a)(1)(B).

[81]*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[82]*Jessup v. Alcoa*, 481 F.3d 1004, 1006 (8th Cir. 2007).

under an abuse of discretion standard "'only if it is arbitrary and capricious.'"[83] When the insurance company "both determines whether an employee is eligible for benefit and pays benefits out of its own pocket," there is a conflict of interest, which should be taken into consideration when determining whether there was an abuse of discretion.[84]

Plaintiff contends that a *de novo* standard is appropriate in this case because "the administrator operated under a financial conflict of interest which resulted in a failure to use proper judgment and a serious procedural irregularity."[85] I disagree. Additionally, there does not appear to be any procedural irregularity in the record. Because AT&T delegated discretion to Sedgwick, the abuse of discretion standard applies.[86]

### B. Decision to Terminate Plaintiff's LTD Benefits

As set out above, a plan administrator's decision will be reversed under an abuse of discretion standard "'only if it is arbitrary and capricious.'"[87] According to Webster's Dictionary, arbitrary means based on impulse or whim;[88] capricious means characterized by or subject to whim.[89] A plan administrator's decision "need be only reasonable, meaning that it must be

---

[83]*Groves v. Metro. Life Ins. Co.*, 438 F.3d 872, 874 (8th Cir. 2007) (quoting *Herbert v. SBC Pension Benefit Plan*, 354 F.3d 796, 799 (8th Cir. 2004)).

[84]*Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346 (2008).

[85]Doc. No. 23.

[86]*Mooney v. AT&T Disability Income Plan #1*, No. 4:08-CV-00639-JMM, 2009 WL 801782, at *4 (E.D. Ark. Mar. 25, 2009) (citing *King v. Hartford Life and Acc. Ins. Co.*, 414 F.3d 994 (8th Cir. 2005)).

[87]*Groves*, 438 F.3d at 874.

[88]WEBSTER'S NEW RIVERSIDE DICTIONARY 37 (Revised Edition 1996).

[89]WEBSTER'S NEW RIVERSIDE DICTIONARY 106 (Revised Edition 1996).

supported by substantial evidence."[90] A plan administrator's decision need not give more weight to a treating physician's opinion.[91] Peer review of a treating physician's records is an accepted method of review.[92] If a plan administrator's decision is based on relevant evidence that a reasonable person could find supports the conclusion, the decision should be upheld.[93]

### 1.  Plaintiff's Failure to Provide Records

Defendants first argue that the termination of LTD benefits was proper because Plaintiff failed to provide the medical records requested.[94] As Plaintiff points out, "this was not the result of willful neglect" by her.[95] It seems to me that Plaintiff believed she had already provided an appropriate response when she submitted the completed questionnaire on November 12, 2008. As soon as Plaintiff received her termination letter, she contacted Sedgwick and sent the documents requested in order to correct the problem.[96] Plaintiff argues that "given the volume of documents going back and forth in the mail during the October-November 2008 time period,

---

[90]*Alexander v. Trane Co.*, 453 F.3d 1027, 1031 (8th Cir. 2006).

[91]See *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003).

[92]See *Dillard's Inc. v. Liberty Life Assur. Co.*, 456 F.3d 894 (8th Cir. 2006); *Weidner v. Fed. Express Corp.*, 492 F.3d 925 (8th Cir. 2007).

[93]*King*, 414 F.3d at 999.

[94]Doc. No. 19.

[95]Doc. No. 27.

[96]Doc. No. 23.

combined with the fact that the plan had always requested medical records on its own in the past, any confusion in this regard is understandable."[97] I agree with Plaintiff.

### 2. Termination of Plaintiff's LTD Benefits

Defendants next argue that Sedgwick's decision to terminate Plaintiff's benefits and uphold that denial on appeal is supported by substantial evidence.[98] Defendants contend Sedgwick received information in 2007 that suggested Plaintiff's condition had improved enough to question her eligibility for LTD benefits.[99] Dr. Hurst's notes from Plaintiff's January, 2007, visit, indicated that Plaintiff had her Meniere's disease under control and the condition only recurred when Plaintiff quit taking her medication.[100] A couple of months later, Dr. Dornhoffer noted that Plaintiff had not had an episode of vertigo for approximately four months and her last episode lasted only five minutes.[101] At this time, Sedgwick made an internal notation to follow-up with her six months later because her condition had seemingly improved.[102] Sedgwick also points to Dr. Dornhoffer's August, 2, 2007, report.[103] Dr. Dornhoffer's notes state that while Plaintiff did suffer from vertigo for two days after her mid-July right ear operation, she "has been good since."[104]

---

[97]Doc. No. 27.

[98]Doc. No. 19.

[99]*Id.*

[100]AR 442.

[101]AR 292, 1401.

[102]AR 293.

[103]AR 411-12.

[104]*Id.*

In October, 2007, Sedgwick followed-up with Plaintiff, and in January, 2008, after a full review of her medical records, Sedgwick concluded that Plaintiff was no longer eligible for LTD benefits. When Plaintiff appealed, Sedgwick sought the opinion of two independent physician advisors. Dr. Klein and Dr. Sonne reviewed all of Plaintiff's records, including Dr. Dornhoffer's notes from March 17, 2008; Dr. Dornhoffer's earlier notes stating Plaintiff could return to work in a sedentary job; and Dr. Jiu's notes that Plaintiff's work restrictions were temporary in nature. Dr. Klein and Dr. Sonne both concluded that no functional limitation would prevent Plaintiff from returning to her regular job or from performing any job.[105] Based on the record, it appears Sedgwick's decision to terminate Plaintiff's benefits and uphold that decision on appeal was reasonable and supported by substantial evidence.

Among others, Plaintiff makes three arguments to support her contention that Sedgwick's decision was an abuse of discretion. First, Plaintiff argues that Sedgwick never questioned Plaintiff's disability until Sedgwick had recovered the full Social Security offset from Plaintiff in September, 2007.[106] Plaintiff claims that there was no longer "a financial incentive for [Sedgwick] to continue recognizing Ms. Dickens' period of eligibility."[107] However, Sedgwick received updated information in January, 2007, that indicated Plaintiff's condition had improved. Sedgwick made an internal notation to follow-up with Plaintiff six months later, and Sedgwick did just that. It seems to me that the information Sedgwick eventually received from the follow-up in October, 2007, triggered Plaintiff's termination of benefits -- not the payment of the Social Security offset.

---

[105]AR 1293, 1297.

[106]Doc. No. 27.

[107]*Id.*

Plaintiff next argues that Sedgwick's decision to uphold the termination on appeal was an abuse of discretion because it contradicted Plaintiff's treating physician.[108] Specifically, Plaintiff points to Dr. Dornhoffer's March 17, 2008, report, which notes no significant changes and that Plaintiff is "still not able to work."[109] In response, Sedgwick contends, and I agree, that it "was not obligated to accord special deference to the opinion of the plaintiff's treating physician over its own reviewing physicians."[110] Sedgwick was not required to give more weight to Dr. Dornhoffer's March 17, 2008, notes. Sedgwick relied on the professional opinion of Dr. Klein and Dr. Sonne, both of whom concluded that Plaintiff was not disabled from any job beginning on February 1, 2008.

Plaintiff's third argument is that Sedgwick was not aware of Dr. Dornhoffer's opinion regarding Plaintiff's disability because "its 'independent' examiner imposed an arbitrary twenty-four hour deadline to return his phone call."[111] Dr. Klein attempted to contact Dr. Dornhoffer, and Dr. Klein never received a call back; therefore, Dr. Klein relied on all of Plaintiff's medical records to render his opinion as to Plaintiff's disability. Dr. Klein was not required to contact any of Plaintiff's treating physicians, yet he chose to do so. Further, as set out above, peer review of a treating physician's records is an accepted method of review. Plaintiff argues that "a

---

[108]*Id.*

[109]AR 1285-86.

[110]Doc. No. 19; *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 925 (8th Cir. 2004) (citing *Nord*, 538 U.S. at 823-24); see also *Mooney*, 2009 WL 801782, at *5 ("It is well settled that 'when a conflict in medical opinions exists, the plan administrator does not abuse his discretion by adopting one opinion, if reasonable, and finding that the employee is not disabled.'") (quoting *Smith v. UNUM Life Ins. Co. of America*, 305 F.3d 789, 794 (8th Cir. 2002)).

[111]Doc. No. 27.

fiduciary's decision to simply ignore an examining physician's opinion is puzzling."[112] That is not the case here because Dr. Klein did, in fact, review the notes of all of Plaintiff's treating physicians and concluded that Plaintiff was capable of returning to work.

## CONCLUSION

Based on the record, Sedgwick's decision to terminate Plaintiff's benefits was reasonable, supported by substantial evidence, and not arbitrary and capricious. Accordingly, Defendants' Motion for Summary Judgment (Doc. No. 18) is GRANTED and Plaintiff's Motion for Summary Judgment (Doc. No. 21) is DENIED.

IT IS SO ORDERED this 18th day of June, 2009.

/s/Wm. R. Wilson, Jr.
UNITED STATES DISTRICT JUDGE

---

[112]*Id.*